### WALTERS et al. *v.* WESTERN & A. R. CO. et al.

#### (Circuit Court, N. D. Georgia. February 17, 1893.)

CARRIERS—BILLS OF LADING—INNOCENT PURCHASERS.

A firm of merchants in A. were also engaged in the milling business at M., on the line of defendant's railway. For their convenience, defendant established a station at M., and appointed one member of the firm its agent there. It was shown that the business of the station was practically transacted in the firm's office at A., and freight charges were settled from time to time with defendant's officials. Goods shipped by the firm at A., consigned to themselves at M., were delivered without presentation of the bill of lading, and it appeared doubtful whether, in the case of such shipments, there was ever any actual delivery of any bill of lading from hand to hand. Some of these bills of lading, after the goods were delivered to the consignees, were transferred by the firm, as collateral, to persons who had no knowledge of any irregularity. *Held,* that the defendant was liable on these bills of lading in the hands of innocent purchasers, since it was by reason of its own negligence that they came into their hands. Friedlander v. Railway Co., 9 Sup. Ct. Rep. 570, 130 U. S. 416, distinguished.

In Equity. On exceptions to master's report. Intervention of H. T. Inman in the suit of William T. Walters against the Western & Atlantic Railroad Company and others. Exceptions sustained.

Mayson & Hill, for intervener.

Julius L. Brown, for W. & A. R. Co.

NEWMAN, District Judge. The case of Friedlander v. Railway Co., 130 U. S. 416, 9 Sup. Ct. Rep. 570, cited by counsel for the receivers, settles conclusively the question that, where an agent of a common carrier issues a bill of lading in collusion with another person, when no goods are actually delivered, the carrier com-

pany is not responsible on such bill of lading, in the hands of an innocent purchaser. The principle thus determined would seem to apply with equal force where the agent of a common carrier, after a bill of lading was accomplished,—that is, after the goods for which the bill of lading was issued had been delivered to the consignee, and the bill of lading delivered up to the agent, it was subsequently, by collusion, returned by the agent to the consignee, and sold by the latter, even though to an innocent purchaser.

The facts in this case appear to be that Akers & Bro. were merchants in Atlanta, and they also were engaged in the milling business, having a mill on the line of the Western & Atlantic Railroad. A station called McIvors was established for their benefit, and one of the firm was appointed agent for this station. Taking all the evidence together, it seems that the business of the station was really carried on in the office of the firm, in Atlanta, and that there never was, as to any shipment of goods, perhaps any actual delivery of a bill of lading from hand to hand, or any actual transfer of any kind whatever. The charges for freight seem to have been settled with the proper officials of the road from time to time. Bills of lading for goods, in accordance with the custom as to such matters, were used as collateral for amounts due for the purchase of grain, for borrowed money, and otherwise. That the course of business was quite irregular, long continued, and calculated to deceive and impose upon those who dealt with the firm of Akers & Bro., is beyond question, from the facts disclosed in the evidence. It seems to have been entirely within the knowledge of the higher officials of the road, certainly of the general freight agent, that bills of lading for goods shipped to this firm at McIvors were being largely used by them as security, with persons who dealt in such paper; and yet, until after these bills of lading had been accepted as collateral by the intervener in this case, no steps seem to have been taken to so regulate the business at this agency as to prevent any imposition upon the public. A quotation from the case of Friedlander v. Railway Co., supra, is applicable here. The court says:

"It is a familiar principle of law that where one of two innocent parties must suffer by the fraud of another the loss should fall upon him who enabled such third person to commit the fraud, but nothing that the railroad company did or omitted to do can be properly said to have enabled Lahnstein to impose upon Friedlander & Co."

Can that be said of the Western & Atlantic Railroad Company in this case? Is it not what the company omitted to do that enabled Akers & Bro. to place this paper in the hands of Inman? If the railroad company had required any systematic conduct of the business at McIvors, the use of bills of lading after goods had been delivered would seem to have been impossible. To say the most of it in favor of the company, it certainly would have been exceedingly improbable that the bills of lading could have been used in the market. To make one of the firm, which is almost the only consignee of goods delivered at a station, the agent at that station, charged with responsibility of the business, as between

the company and his firm, is itself at least a very unusual proceeding: and when that business is allowed to be carried on for years in the office of the firm, at a place away from the station where the goods are delivered, and in the office of the consignees themselves, it becomes still more unusual. But when no precaution is taken, whatever, to see that bills of lading for goods are canceled, this condition of things existing, it becomes remarkable; and how the company, with this state of facts shown, can shield itself with the defense that its agent issued accomplished bills of lading, I am unable to see. If this company did not, both by its action and nonaction, put it in the power of Akers & Bro. to perpetrate a fraud upon innocent persons, it would be difficult to imagine a case where the rule on that subject, as expressed in the foregoing quotation, would apply. In the Friedlander Case, supra, as well as in the former cases previously decided by the supreme court, and therein cited, the company was entirely innocent of any wrongdoing or any negligence, so far as the report of the case shows. The agents of the companies had fraudulently issued bills of lading when no goods were delivered, and the courts hold that they acted beyond the scope of their authority as agents; that their authority was to issue bills of lading for goods delivered, but, when they undertook to issue bills of lading when no goods whatever were delivered, they went beyond the scope of their agency, and the principal was not bound. That would be true here, of course, if the facts were like the facts in those cases, but they are entirely different.

When this case was first presented I was not sure but that the dates of the bills of lading were such as to put the intervener to the exercise of more care than he appeared to have taken, to ascertain the real facts in connection with the shipments of goods embraced in the bills of lading. It seems, though, under the evidence, that it was not at all an uncommon thing for bills of lading to be out the length of time these had been when they were presented to Inman as collateral. And, indeed, it seems that even Mr. Dickey, the general freight agent of the company, thought, when they were first presented to him, that they were all right, and that Akers & Bro. had the right to use them as they did. Whatever the statements made by Dickey when he was questioned by Inman on this subject may be worth as admissions on the part of the company that the bills of lading were good, (and I am not sure that his statements had any value in this respect,) they certainly are important as showing that Inman was not guilty of negligence in accepting this paper at the time he did. The evidence in this case shows that Akers & Bro. failed in business, and that at the time of their failure they delivered to the Western & Atlantic Railroad Company a mortgage on certain properties to secure it against loss. One of the provisions of the mortgage is as follows:

"This conveyance is made for the following purpose: Said Western & Atlantic Railroad Company has heretofore delivered to us, at different times, shipments of corn, wheat, and oats, and flour, which were consigned to us by various persons; said deliveries being made without requiring the production of the bills of lading or railroad receipts for, or connected with, such

shipments, and certain of such bills of lading and receipts as are now outstanding, in the hands of persons who claim that said company is liable to them for making such deliveries; and this conveyance is made to secure said company, and hold it harmless from loss on account of such claims: Now, if we shall hold said company harmless from loss on account of such claims, and shall fully reimburse and pay to it all such sums as it may have to pay on account thereof, then this conveyance to be void."

This mortgage was accepted by the railroad company and went of record. It may be stated, in addition to what appears before, as to the delivery of goods by the Western & Atlantic Railroad Company to Akers & Bro. without the receipt of the bills of lading, that the acceptance by the company of this mortgage, containing the statement that this had been done, may be cited as additional evidence in favor of the conclusion of the court from this record that such was the fact.

It seems entirely clear that the intervener here should, with any other persons who are similarly situated, have the benefit of this mortgage. How far it would be available as to this intervener is left uncertain by the evidence. A further reference of the case to ascertain the true status of this matter would be proper, if the case was not controlled otherwise. The receivers may possibly be protected by this mortgage from loss by reason of any amount that may be paid to Inman, or they may not, but this would be immaterial, if the view taken of the case on other grounds is correct.

For the reason heretofore stated the receivers are considered and held liable to the intervener upon all these bills of lading. There seems to be no doubt, under the evidence, that the value of the shipments embraced in the bills of lading were sufficient in each case to cover the amount of the notes for which these bills of lading were used as collateral. The conclusion is that the exception filed by the intervener, that the master erred in holding that the railroad company was only liable on the two bills of lading attached to note No. 3, must be sustained. Judgment may be entered, after the correct amount of the same may be fixed, in accordance with the views herein expressed.